## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INTERSTATE BAKERIES CORP., et al., | ) | Case No. 04-45814 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| U.S. BANK NATIONAL ASSOCIATION, in | ) | |
| its capacity as Trustee of the IBC | ) | |
| Creditors Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 09-4177 |
| | ) | |
| Spectra Marketing Systems, Inc.; SMF | ) | |
| Energy Corporation, f/k/a or d/b/a Streicher | ) | |
| Mobile Fueling, Inc.; Global Crossing | ) | |
| Telecommunications, Inc. Constantia | ) | |
| Colmar, Inc. f/k/a, a/k/a or d/b/a H | ) | |
| & N Packaging Systems, Inc.; City of | ) | |
| Alexandria, Louisiana, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In this adversary proceeding, the Trustee of the IBC Creditors Trust seeks to recover $67,965.53 in preferential transfers made to Defendant SMF Energy Corp. by Merita Bakery, an affiliate of the Debtor, Interstate Bakeries Corp.[1]  Following an order entered on November 11, 2010, in which the Court granted the Trustee's request for summary judgment on most issues, the only issues left to be tried were whether SMF Energy Corp. could shield certain of the transfers from avoidance as contemporaneous exchanges for new value, pursuant to § 547(c)(1), or as transfers made in the ordinary course of business, pursuant to § 547(c)(2).[2]  The Court heard evidence on December 17, 2010, and took the matter under advisement.

---

[1] The Creditors Trust was established under terms of the confirmed Chapter 11 Plan filed by Interstate Bakeries and its affiliates.  Only the issues involving SMF Energy Corp. were heard at the trial on December 17, 2010.

[2] The November 11, 2010 order established that all of the transfers constituted preferential transfers under 11 U.S.C. § 547(b) and that SMF was entitled to a new value "credit" of $13,187.07 under § 547(c)(4).

Upon consideration of the evidence adduced at trial and the relevant law, the Court finds that SMF failed to establish that any of the transfers could be shielded from avoidance under § 547(c)(1) or (c)(2).  After giving SMF a new value credit of $13,187.07, as noted above, the Trustee  is entitled to judgment against SMF for $54,778.46.

## BACKGROUND

1.     The Defendant, SMF Energy Corporation f/k/a or d/b/a Streicher Mobile Fueling, provided vehicle fuel for Merita Bakery, an affiliate of the Debtor, Interstate Bakeries Corp., from September 27, 2002, until July 17, 2004.  SMF and Merita Bakery are or were located in Ft. Lauderdale, Florida.

2.     Interstate Bakeries Corp., and seven affiliates filed for protection under Chapter 11of the Bankruptcy Code on September 22, 2004 ("Petition Date").  Consequently, the "preference period" of 11 U.S.C. § 547 ran from June 24, 2004 to September 22, 2004.[3]

3.     In the preference period, Merita made the following four payments to SMF:

| PAYMENT DATE[4] | AMOUNT |
|---|---|
| June 29, 2004 | $13,187.07 |
| August 2, 2004 | $7,006.16 |
| August 9, 2004 | $31,617.09 |
| August 29, 2004 | $16,155.21 |
| **TOTAL** | **$67,965.53** |

4.     On September 20, 2006, the Debtor filed a complaint under 11 U.S.C. § 547 and § 550 to avoid and recover these payments ("Transfers").  From the filing of that complaint to the filing of this adversary on August 20, 2009, the Debtor (and subsequently U.S. Bank, as trustee for the IBC Creditors Trust) sought leave from the Court on several occasions to extend the time to serve process on the defendants named in the original action and to bifurcate the proceeding into actions with fewer defendants.  The Court granted each request.

---

[3] 11 U.S.C. § 547(b)(4).

[4] For purposes of § 547(b), "transfers" by check are deemed made on the date that the check is honored by the bank. *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). But for the purposes of the new value and ordinary course defenses of § 547(c), the transfer is deemed to occur upon delivery of the check to the payee, so long as the check is negotiated within a reasonable time thereafter.

2

5.    On November 11, 2010, the Court entered an order resolving cross motions for summary judgment, wherein the Court held, *inter alia*, that the Transfers were preferential under the terms of 11 U.S.C. § 547(b), and that SMF was entitled to a new value credit under § 547(c)(4) of $13,187.07.[5]

The remaining factual background relating to the issues tried on December 17, 2010, will be presented below in the Court's analysis of those issues.

## DISCUSSION

### A.    Contemporaneous Exchange for New Value - 11 U.S.C. § 547(c)(1).

Under § 547(c)(1), a preferential transfer may not be avoided to the extent that the transfer was (a) intended by the debtor and the creditor to be a contemporaneous exchange for new value given to the debtor and (b) in fact a substantially contemporaneous exchange.[6]  A creditor asserting a defense under § 547(c)(1) must establish both prongs of the defense.  SMF failed to establish either prong.[7]  In fact, all of the evidence adduced at trial established that Merita made the Transfers for the purpose of paying its antecedent debts and that the transfers were not substantially contemporaneous.  In the parties' Stipulation, SMF conceded that SMF and Merita ceased their business relationship in July 2004 and that SMF last provided goods or services to Merita on or about July 17, 2004.  The first Transfer, however, did not occur until two weeks later on August 2, 2004, and the uncontroverted evidence indicates that that Transfer was intended (and was received) as payment for invoices dated from May 31, 2004 to June 26, 2004.  Thus, the August 2, and, *a fortiori*, the subsequent Transfers, were not intended to be contemporaneous exchanges for new value nor were they substantially contemporaneous.[8]

---

[5] In its motion for summary judgment, SMF had argued that it was entitled to a new value credit of $28,292.28, representing the market value of all fuel it delivered to Merita during the preference period.  The Court limited it to $13,187.07 because all of these deliveries occurred prior to the August 2 payment, and as discussed in the order, a creditor's new value credit under § 547(c)(4) cannot be credited against subsequent transfers.

[6] 11 U.S.C. § 547(c)(1).

[7] SMF did not explicitly abandon this defense at trial, but it offered no evidence or argument in support of it.

[8] *See In Medimaging Technology Inc. v. Mallinckrodt, Inc.* (*In re Medimaging Technology, Inc.*), 2007 WL 3024068 (Bankr. D. Md.  2007) (finding no intent to make contemporaneous exchange for new value where no shipments were made as a result of a debtor's payments).

**B.  Ordinary Course of Business – 11 U.S.C. § 547(c)(2).**

As noted in the November 11 Order, the pre-BAPCPA version of 11 U.S.C. § 547(c)(2) applies to this case because the underlying bankruptcy case was filed prior to BAPCPA's enactment.[9]  Under the pre-BAPCPA version of § 547(c)(2), to shield a transfer from avoidance, a transferee of a preferential transfer has to prove, by a preponderance of the evidence, that the transfer was: (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; <u>and</u> (C) made according to ordinary business terms.[10]  The ordinary course defense is narrowly construed, and the failure to prove any one of these elements dooms the entire defense.[11]

The Plaintiff does not dispute, and the evidence adduced at trial established, the first element of § 547(c)(2), *i.e.*, that the Transfers were made in payment of debts incurred in the ordinary course of Merita's and SMF's business.  But SMF failed to establish the second and third elements.

**1.  Section 547(c)(2)(B) - The Subjective Test.**

To satisfy § 547(c)(2)(B), the transferee of a preferential payment must show that the payment(s) was subjectively ordinary between the parties.  The overriding factor as to whether a transfer is subjectively ordinary under § 547(c)(2)(B) is whether there is some consistency between the payments the debtor made to the transferee prior to the preference period and the payments made in the preference period.[12]  Consistency is generally evaluated by a comparison of two aspects of the parties' business relationship: the timing of payments made before and during the preference period

---

[9] The Bankruptcy Abuse Prevention and Consumer Protection Act (popularly known as "BAPCPA," at least by those regularly involved in bankruptcy matters), 109 P.L. 8 § 1501(b)(1) ("[T]he amendments made by this Act shall not apply with respect to cases commenced under title 11, United States Code, before the effective date of this Act."). *See also Guerriero v. Kilroy* (*In re Kilroy*), 354 B.R. 476, 496 (Bankr. S.D. Tex. 2006) (pre-BAPCPA law applies in an adversary proceeding filed after October 17, 2005, where the main case was filed before October 17, 2005).

[10] As amended by BAPCPA, a transferee need only prove that a transfer was made in the ordinary course of business of the debtor and transferee <u>or</u> made according to ordinary business terms.  In other words, subsections (B) and (C) are now stated in the disjunctive, whereas they had previously been stated in the conjunctive.

[11] *See, e.g., In re Armstrong*, 291 F.3d 517, 527 (8th Cir. 2002).

[12] *See Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497-98 (8th Cir. 1991).

4

and whether the creditor's collection efforts departed from the norm during the preference period.[13] The evidence adduced at trial did not establish that the timing of Merita's payments or that SMF's collection activities with regard to Merita during the preference period were consistent with their pre-preference period norms.  In fact, the evidence showed the opposite.

### a.    The timing of Merita's payments to SMF changed during the preference period.

On the timing issue, SMF advances two seemingly contradictory positions.  On one hand, SMF vehemently denies that Merita's payment pattern was any different during the preference period than it was prior to the preference period.  According to SMF's two witnesses – Michael Shore, SMF's Chief Financial Officer and Senior Vice President, and Lorraine Wickwire, SMF's Director of Credit – payments in the mobile fueling industry are analyzed in 30-day increments, or "buckets," and Merita's payments fell in the same buckets prior to and during the preference period. On the other hand, SMF acknowledges that Merita's payments were made later than usual during the preference period, but it argues that the payments should still be considered "ordinary" for purposes of § 547(c)(2)(B) because the delay was due to a change in the way Merita paid its invoices.  Prior to the preference period, Merita paid its invoices in-house at its facility in Ft. Lauderdale, whereas during the preference period IBC and its affiliates switched over to a centralized payment process located in Texas.  The Court does not need to resolve this contradiction, however, because neither argument has merit.

SMF's "bucket" argument has two flaws.  First, it confuses an objective criterion with a subjective criterion.  For purposes of the subjective test, it is irrelevant how accounts are handled in the industry.  Section 547(c)(2)(B) is concerned solely with a comparison of the parties' pre-preference and preference period payment conduct, which may or may not depart from industry norms.

Second, the argument paints "ordinary course" with too broad a brush (or puts it in too large a "bucket," to fit the analogy to this case).  Although there is some variation in the methods courts

---

[13] *Central Hardware Co., Inc. v. The Walker-Williams Lumber Co.* (*In re Spirit Holding Co., Inc.*), 214 B.R. 891, 897 (E.D. Mo. 1997) ("Among the factors courts consider in determining whether transfers are ordinary in relation to past practices between the debtor and transferee creditor are… whether the debtor or the creditor engaged in any unusual collection or payment activity…") *aff'd* 153 F.3d 902 (8th Cir. 1998).  *See also Florida Steel Corp. v. Stober* (*In re Industrial Supply Corp.*), 127 B.R. 62 (M.D. Fla. 1991), *aff'd* 961 F.2d 1582 (11th Cir. 1992) (holding that unusual creditor pressure alone can negate an ordinary course defense).

use to evaluate the ordinariness of a preference period payment (as compared to the pre-preference period),[14] it is well established that § 547(c)(2)(B) requires a much finer analysis than SMF has been willing to engage in.

The Plaintiff has offered several useful and appropriate ways of analyzing SMF's and Merita's pre-preference and preference period data. All of them strongly indicate that Merita's payment behavior changed significantly in the preference period. For example, prior to the preference period, Merita paid SMF an average of 30 days after invoice date, whereas during the preference period that average increased to 48.5 days. In terms of percentages, prior to the preference period Merita paid 94% of its invoices within 45 days, whereas during the preference period Merita paid only 56.8% of its invoices within 45 days. Based on this data, the Court finds that the Transfers were inconsistent with pre-preference period practice.

Finally, the Court rejects SMF's contention that Merita's preference period delays in payment should be excused because they were unrelated to Merita's impending bankruptcy. Quite simply, there is nothing in the statute (or pertinent case law) that provides an exception for departures from the ordinary course for apparently non-bankruptcy related reasons.[15] SMF has offered no such support. Moreover, SMF has offered no evidence that the Debtor's adoption of a centralized invoicing and payment system wasn't related to the Debtor's slide into bankruptcy; it could just as easily have represented an effort to replace an inefficient financial system.

### b. SMF's collection efforts were more aggressive during the preference period than they had been in the past.

"[P]roof of an unusual collection effort has a tendency to show that a transfer occurred outside the ordinary course of business."[16] For purposes of the subjective test of § 547(c)(2)(B),

---

[14] *See, e.g., Lovett v. St. Johnsbury Trucking,,* 931 F.2d 494,497 (8th Cir. 1991) (comparing statistical distribution of payments); *Official Unsecured Creditors Committee. v. Expeditors International of Washington, Inc.* (*In re: Gateway Pacific Corp.*), 205 R.R. 164, 168 (Bankr. E.D. Mo. 1997) (comparing average invoice age and percentage of timely payments), *aff'd* 153 F.3d 915 (8th Cir. 1998).

[15] *See In re Spirit Holding Co., Inc.*, 214 B.R. at 898-9 (finding the cause for a departure from prior practice – the form of payment in this case – irrelevant for purposes of § 547(c)(2)(B)).

[16] *In re Spirit Holding Co., Inc.*, 153 F.3d 902 (8th Cir. 1998).

6

collection activity is considered unusual if it is differs from actions taken in the pre-preference period.  The burden is on the defendant to establish the absence of unusual collection activity.[17] SMF failed to carry this burden.

Despite the time and energy SMF devoted at trial to disputing that it engaged in unusual collection activity, the facts paint a fairly straightforward picture of collection activity that, while not overly aggressive or even necessarily related to the Debtor's impending bankruptcy, was clearly unusual compared to its pre-preference period relationship with Merita.  SMF's call logs show that prior to the preference period SMF never placed a collection call to Merita, whereas SMF placed three calls to Merita during the preference period.

On July 17, 2004, SMF received confirmation that Merita intended to terminate its business relationship with SMF because Merita had decided to install an on-site fueling facility.  Four days later, on July 21, 2004, an employee named Tyrone left Merita a voice-mail message inquiring about a past due balance.  A Merita employee returned Tyrone's call the next day, at which time Lorraine Wickwire informed Merita that it was past due and was over its credit limit, and that SMF needed a payment promptly for $32,359.28.  Apparently, it was at this time that Merita informed SMF that control of Merita's payables had been moved to the Debtor's corporate office in Texas.

SMF's call log indicated that Tyrone placed a second call on August 2, 2004 and "left [a] message for accounts payable to return call."

The final call noted in the log – which was vigorously contested by SMF – was allegedly placed on August 9, 2004.  The log indicated that SMF's employee Tyrone again  left a message on Merita's "helpline" and advised Merita that its account was "60 days past due and possible legal actions may need to be taken to get account current."  Wickwire and Shore vehemently denied that the August 9 call was made and suggested that the notations in the log shouldn't be trusted because Tyrone was not a good or competent employee.  They then conceded that if the call was placed, the log was incorrect because SMF would have never threatened legal action on an account less than

---

[17] *See Jacobs v. Matrix Capital Bank* (*In re AppOnline.com, Inc.*), 315 B.R. 259, 284 (Bankr. E.D. N.Y. 2004) ("The burden is on the creditor to show 'the absence of any unusual collection efforts or protectionist demands directed at the debtor, and the absence of any other significant or material change in the way it treated the debtor during the preference period. . . .").

90 days past due.  The Court declines to throw Tyrone "under the bus" or throw out his call log notations based on Wickwire's and Shore's testimony.  Their testimony was self-serving and lacked credibility, and most important, the Court believes that the contemporaneous call log is simply the best evidence of SMF's collection activities at the time.

Putting aside the potentially aggressive tone of the August 9 call, the Court still finds it significant that the first collection calls SMF ever placed to Merita occurred during the preference period.  In all likelihood, those calls were placed in response to Merita's termination of the business relationship and not because SMF suspected that Merita was headed for bankruptcy.  But SMF's motivation for making the calls is irrelevant for purposes of § 547(c)(2)(B); all that matters is that SMF's collection attempts during the preference period departed from the parties' ordinary course of business.[18]

For these reasons, the Court finds that the Transfers fell outside of the parties' ordinary course of business for purposes of § 547(c)(2)(B).

### 2.  Section 547(c)(2)(C) - The Objective Test.

In contrast to the subjective test of § 547(c)(2)(B), the objective test in § 547(c)(2)(C) focuses on whether preferential transfers are consistent with industry norms prevailing at the time the transfers were made.  Courts in the Eighth Circuit approach the objective test from two perspectives.  Some courts require a transferee to demonstrate that the transfers were consistent with the business terms prevailing within the *debtor's* industry,[19] whereas other courts require the transferee to show that the transfers were consistent with terms prevailing in the *creditor's* industry.[20]  In this case, it doesn't matter from which perspective the Transfers are viewed because SMF failed to establish that the Transfers were made according to ordinary business terms in either industry.  SMF offered no evidence or testimony to establish that the Transfers were ordinary in Merita's industry and what evidence it offered to establish that the Transfers were ordinary in SMF's

---

[18] *See supra* n. 14.

[19] *See Jones v. United Sav. & Loan Assoc.* (*In re U.S.A. Inns*), 9 F.3d 680, 684 (8th Cir. 1993).

[20] *See In re Spirit Holding Co., Inc.*, 214 B.R. at 899.

industry – the testimony of Michael Shore – was unreliable and insufficient under the standards applicable in the Eighth Circuit for such testimony.

Expert testimony is not necessary to establish the prevailing terms in an industry; employees of a defendant-transferee can testify to show that transfers were "made according to ordinary business terms."[21] However, the witness must: 1) have <u>specific</u> knowledge of its competitors' practices during the preference period,[22] and 2) have obtained the information <u>objectively</u>, *i.e.*, outside of his or her subjective experiences as an employee of the creditor/defendant.[23]  Shore's testimony satisfies neither of these requirements.

Aside from Shore's inability to identify more than two of SMF's competitors (another factor undermining the reliability of his testimony), Shore was unable (or unwilling) to testify as to the *specific* collection practices in the mobile fueling (or similar) industry.  Shore insisted that the collection practices in the industry are based on a 30-day "bucket" system, whereby accounts are categorized according to whether they are paid between 0-30, 31-60, 61-90, or 90 days past invoice date and that collection calls are placed only after an account is 90 days past due.  Shore resisted putting a finer point on this analysis because, he insisted, the industry just doesn't do it that way.

It may well be that the mobile fueling or petroleum supply industry might generally function on a bucket system and that collection calls are not made before an account falls into the 90-day and older bucket, but the ordinary course of business defense requires a greater degree of specificity than 30-day buckets.[24]  Quite simply, for purposes of § 547(c)(2)(C), it matters whether a debtor consistently pays its bills thirty-one days after it is invoiced or fifty-nine days after it is invoiced.

---

[21] *See Shodeen v. Airline Software, Inc.* (*In re Accessair, Inc.*), 314 B.R. 386, 394 (B.A.P. 8th Cir. 2004) ("It is certainly true that an employee of the transferee can establish the prevailing industry standards based on that employee's personal knowledge of those standards.") (citing *In re U.S.A. Inns*, 9 F.3d at 685-86).

[22] *See In re Spirit Holding Co., Inc.*, 214 B.R. at 901.  *See also In re Schwinn Bicycle Co.* 205 B.R. 557, 573 (Bankr. N.D. Ill. 1997) ("A creditor's evidence on the 'ordinary business terms' may not be vague and must be based on personal first-hand knowledge gained from exposure to the competitors' collections practices during or near the preference period.").

[23] *See In re Bridge Information Systems, Inc.*, 460 F.3d 1041, 1044-45 (8th Cir. 2006) (noting that trial court properly required evidence of an "independent, objective standard of the practices of the relevant industry").  *See also In re Accessair, Inc.*, 314 B.R. at 394-95 (citing *In re Midway Airlines*, 69 F.3d 792, 797-98 (7th Cir. 1995); *Lawson v. Ford Motor Co.* (*In re Roblin Industries, Inc.*), 78 F.3d 30, 43 (2d Cir.1996)).

[24] *See supra* n. 13.

Both would fall into the same "bucket," but an approximate 90% change in payment practices is statistically and legally significant.[25]  Consequently, the Court finds that Shore's testimony lacks the specificity necessary to satisfy § 547(c)(2)(C).

Shore's testimony also lacks the requisite objectivity.  An employee-witness testifying in support of the objective requirement of § 547(c)(2)(C) must have some experience outside of his or her current employment in the industry, or at least have knowledge gained from industry seminars or workshops.[26]  When a witness's testimony covers only that employee's own subjective experiences, that "is insufficient by itself to establish the range of terms prevailing within the industry as required by § 547(c)(2)(C)."[27]

Shore testified that he had no experience in the mobile fueling industry outside of his employment with SMF.  Prior to being employed by SMF, Shore's experience was limited to public accounting and the restaurant and hospitality industry.  And Shore stated in his deposition that he had not attended or obtained knowledge from any trade meetings.  Shore's sole experience with mobile fueling or petroleum industry collection practices and norms comes from his involvement in the acquisition of two of SMF's competitors after the relevant time period.[28]  In sum, Shore lacks the independent experience necessary to testify objectively with regard to the relevant industry collection practices and norms, and thus SMF has failed to meet its burden under § 547(c)(2)(C).

---

[25] *See e.g.*, *Official Unsecured Creditors Committee. v. Expeditors International of Washington, Inc.* (*In re: Gateway Pacific Corp.*), 205 R.R. 164, 168 (finding a 54% change significant).

[26] *See In re Spirit Holding Co., Inc.*, 214 B.R. at 901 (citing *In re Jones Truck Lines, Inc.*, 196 B.R. 483, (Bankr. W.D. Ark. 1995) *rev'd on other grounds*, *In re Jones Truck Lines, Inc.* 130 F.3d 323 (8th Cir. 1997)).

[27] *In re Accessair, Inc.*, 314 B.R. at 395.

[28] SMF acquired Shank Services in February 2005 and H&W Petroleum in October 2005.

**C.    The Plaintiff is not entitled to pre-judgment interest**.

The Plaintiff requests an award of pre-judgment interest from July 10, 2009, the date it sent two letters to SMF demanding repayment of the Transfers.  This request will be denied.

The decision to award pre-judgment interest rests in the Court's discretion.[29]  A plaintiff is entitled to pre-judgment interest on a preference claim if the transferee-creditor had the ability to ascertain the amount of its liability on the preference claim without a judicial determination, but not if a good faith dispute exists as to the extent of the creditor's liability.[30]   The fact that a defendant is ultimately found liable for all or part of the amount demanded does not necessitate an award of pre-judgment interest.

Pre-judgment interest is not warranted in this case because the Court finds that SMF's new value and ordinary course of business defenses were both colorable and asserted in good faith.  SMF prevailed on a portion of its new value defense and its failure to prevail on its ordinary course of business defense arose, in the Court's estimation, out of a layman's good faith belief that it hadn't done anything wrong.  The Court believes that SMF's resistance in this case was grounded not in gamesmanship or litigiousness but in its failure to appreciate the degree and specificity of the scrutiny required in a bankruptcy preference action.

## CONCLUSION

As noted at the outset, the only issues remaining for resolution at the December 17, 2010 trial held in this matter were whether any of the Transfers could be shielded from avoidance under § 547(c)(1) or (c)(2).  For the reasons stated above, SMF failed to carry its burden under either of those defenses.  Therefore, the Plaintiff is entitled to a judgment against SMF for $54,778.46, representing the total transfers SMF made to the Debtor during the preference period ($67,965.53), minus a new value credit of $13,187.07.

The Court will enter a separate order and judgment consistent with this opinion.

ENTERED this 12th day of January, 2011.

---

[29] *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1281 (8th Cir. 1988).

[30] *Harrah's Tunica Corp. v. Meeks* (*In re Armstrong*), 291 F.3d 517,528 (8th Cir. 2002).

11

/s/ Jerry W. Venters
HONORABLE JERRY W. VENTERS
UNITED STATES BANKRUPTCY JUDGE

A copy of the foregoing was mailed
conventionally or electronically to:
Brendan McPherson
Herbert Dell